*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ALVIN LEE FRANKLIN,

        Defendant-Appellant.

UNPUBLISHED
January 28, 2020

No. 346137
Kent Circuit Court
LC No. 18-003104-FC

Before: O'BRIEN, P.J., and RONAYNE KRAUSE and GADOLA, JJ.

PER CURIAM.

Defendant, Alvin Lee Franklin, appeals as of right his bench trial conviction of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(e) (actor is armed with a weapon). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 35 to 70 years' imprisonment. We affirm.

## I. BACKGROUND

This case arises from a sexual assault that occurred in October 2014. The victim was walking alone in a park. While she was looking at her phone, defendant struck her from behind, causing her to fall. As she fell, defendant struck her again on the side of her face. After she fell, defendant brandished a silver semi-automatic handgun and told her to remove her clothing. The victim attempted to comply, because she felt she had no choice, but defendant also ripped her shirt and pulled down her pants. Defendant then inserted his penis into her vagina and ejaculated. The victim testified that she was on her back, and although the area was not brightly illuminated, there was sufficient light to see defendant's face clearly. The victim testified that after defendant raped her, he ordered her to lay there and not move. At some point, the victim put on the remains of her clothes and went to a nearby friend's house, where she took several showers and changed clothing. The victim testified that although she used soap, she did not use soap on the inside of her vagina. She then called her mother, who picked her up.

The victim testified that she initially did not want to make a police report or go to the hospital because she was embarrassed and did not want anything to do with the police. However, the next morning she went to the hospital at her mother's insistence. The hospital

-1-

referred the victim to the YWCA, where a forensic medical examination was performed. As part of the examination, swabs were taken from the victim's perineal area, anal area, and both inside and outside her vagina. The swabs were sealed in a rape kit. Due to the backlog at the Michigan State Police forensic laboratory, the victim's rape kit was stored and went untested until 2016, and the kit was outsourced to Sorensen Forensics.

Kirk DeLeeuw, a forensic scientist employed by the Michigan State Police forensic laboratory, was qualified without objection as an expert in DNA analysis. DeLeeuw explained that when the rape kit was finally tested, the testing procedure involved first separating two kinds of cellular material found in the vulvar swab: a "sperm fraction" consisting of sperm cells, and an "epithelial fraction" consisting of all other cellular material.[1] The separation procedure was used because forensic swabs generally contain "a lot of female DNA," which would typically match the victim and exclude anyone else. Defendant was excluded as a donor from the "epithelial fraction," which was common. However, defendant matched the DNA profile found in the sperm cells. The probability of a random individual having a matching DNA profile was one in 6.083 nonillion.[2] Sorensen Forensics completed its analysis of the rape kit on April 21, 2016, whereupon the analysis was returned to the Michigan State Police for further review and confirmation. DeLeeuw performed that review and confirmation.

The record does not indicate when the match to defendant's DNA was first made, although defendant's DNA had already been on file due to defendant's prior incarceration. At a time also unclear from the record, defendant happened to be arrested for an unrelated PPO violation. The investigating officer attempted to talk to defendant, but defendant refused to speak. On January 16, 2018, the victim was shown a photographic lineup, from which she identified defendant. On the same day, a warrant was issued for defendant's arrest. On February 6, 2018, a fresh buccal swab was taken from defendant, with his attorney present, to confirm the match. The Michigan State Police forensic laboratory completed its analysis on March 19, 2018, confirming that the sperm fraction DNA was a match to defendant's DNA. The victim identified defendant at trial. Defendant testified that he had been at his girlfriend's house at the time of the rape, and he had never seen the victim before. The trial court found defendant guilty as noted above.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant concedes that "some evidence of guilt was introduced," but he argues that insufficient evidence supported the verdict. Defendant specifically challenges his identification. We disagree.

---

[1] "Epithelial" refers specifically to the kind of tissue that makes up skin and the linings of body cavities, organs, and blood vessels.

[2] A "nonillion" has thirty zeros. A billion has nine zeros. For reference and comparison, the current human population of the Earth is estimated to be approximately 7.6 to 7.7 billion. See <https://www.census.gov/popclock/world> and <https://population.un.org/wpp/>.

## A. STANDARD OF REVIEW

Generally, we review a challenge to the sufficiency of the evidence in a bench trial de novo and in a light most favorable to the prosecution to determine whether the trial court could have found that the essential elements of the crime were proved beyond a reasonable doubt. All conflicts with regard to the evidence must be resolved in favor of the prosecution. Circumstantial evidence and reasonable inferences drawn from it may be sufficient to prove the elements of the crime. [*People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005) (quotations and citations omitted).]

In actions tried without a jury, this Court reviews a trial court's factual findings for clear error. MCR 2.613(C); *People v Knight*, 473 Mich 324, 338; 701 NW2d 715 (2005). A factual finding is clearly erroneous if, after review of the entire record, an appellate court is left with a definite and firm conviction that an error occurred. *People v Lanzo Const Co*, 272 Mich App 470, 473; 726 NW2d 746 (2006).

## B. WITNESS CREDIBILITY

Defendant does not seriously dispute, nor could he, that the victim's testimony alone, if believed, amply supports a finding that all elements of CSC-I had been proved beyond a reasonable doubt. See *People v Szalma*, 487 Mich 708, 724; 790 NW2d 662 (2010). Nevertheless, defendant first argues that the victim was not credible, based on the victim's own criminal history, the four-year gap between the rape and the photographic lineup, the showers she took before the forensic medical examination, her desire to avoid talking to the police in 2014, and the fact that her initial description of defendant was approximately a decade younger than defendant's actual age. The trial court, which was clearly aware of defendant's alleged deficiencies in the victim's credibility, specifically found "the victim to be very credible, without question." Generally, "[t]his Court will not interfere with the trier of fact's determinations regarding the weight of the evidence or the credibility of witnesses." *People v Muhammad*, 326 Mich App 40, 71; 931 NW2d 20 (2018) (quotations marks and citation omitted); see also *McGonegal v McGonegal*, 46 Mich 66, 67; 8 NW 724 (1881).

In any event, none of defendant's claimed deficiencies are concerning. Even taking at face value defendant's implication that a person who has previously committed a crime gives up any right to be free from being the victim of a crime,[3] the victim's criminal history actually bolsters her credibility. In particular, it partially explains why she did not wish to involve herself with law enforcement. Furthermore, the victim's desire to take a shower and avoid discussing

---

[3] A witness's past commission of certain crimes may be introduced for the purpose of attacking the witness's credibility. MRE 609. However, we are unaware of any such crimes, possibly other than perjury, that necessarily destroy a witness's credibility *per se* simply because of their mere occurrence. Defendant has not presented any argument for why or how the victim's particular crimes more than merely *potentially* undermine the victim's credibility.

the matter with law enforcement or medical personnel is normal for a victim of a sexual assault. See *People v Beckley*, 434 Mich 691, 715-716; 456 NW2d 391 (1990) (BRICKLEY, J.) ("there is general agreement among experts that the reactions of a victim of sexual assault vary quite significantly from those of a victim of the 'average' crime."). Her initial assumption of defendant's age, whether in his thirties or forties, and the time between the rape and the lineup, are relatively trivial. Notably, the DNA evidence significantly bolsters the victim's testimony, even though no bolstering was necessary. We find no reason to disturb the trial court's determination that the victim was credible, and we find that there was sufficient evidence that defendant engaged in sexual penetration while armed. See MCL 750.520b(1)(e).

## C. DNA EVIDENCE

Defendant also argues that the DNA identification was not credible. Defendant's argument is difficult to understand and reflects a failure to comprehend the nature of DNA testing.

Insofar as we can determine, defendant's general theory at trial was that because he was excluded as a donor from the *epithelial* portion of the cellular material recovered from the rape kit, he could not have committed the rape. We note that this was properly not an argument actually advanced by counsel. As explained by expert testimony at trial, it is common to not match the epithelial DNA, and defendant *matched* the DNA found in the *sperm* portion of the recovered cellular material. Furthermore, the probability of that DNA match coming from another person is improbable to a degree that is practically impossible. Defendant also appears to be of the belief that the delay between the rape in 2014 and his arrest in 2018 is significant on the supposition that if his DNA had been found, he would have been arrested and charged much earlier. However, the delay was explained to be due to the simple and unfortunate backlog at the Michigan State Police forensic laboratory. Defendant offers no argument or authority explaining how the DNA test results themselves might have been unreliable, and we will not undertake to invent an argument on his behalf. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998); *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004). The evidence of defendant's guilt was overwhelming, not insufficient.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant argues that he was denied effective assistance of counsel because his trial attorney failed to present an alibi defense. We disagree.

## A. STANDARD OF REVIEW

"Whether a defendant was deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law." *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). This Court reviews findings of facts for clear error and questions of law de novo. *Id.* Because defendant did not seek an evidentiary hearing in the trial court, our review is limited to mistakes apparent from the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Defendant has requested a remand for an evidentiary hearing from this Court, which would be appropriate to grant if defendant "set[s] forth any additional facts that would require

development of a record to determine if defense was ineffective." *People v Williams*, 275 Mich App 194, 200; 737 NW2d 797 (2007).

In order to receive a new trial on the basis of ineffective assistance of counsel, defendant "must show both that counsel's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith v Spisak*, 558 US 139, 149; 130 S Ct 676; 175 L Ed 2d 595 (2010) (quotation marks and citation omitted); *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). "Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy." *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). Accordingly, a defendant must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *Trakhtenberg*, 493 Mich at 62.

Furthermore, defense counsel has a duty to undertake reasonable investigations or to make a reasonable decision that renders particular investigations unnecessary. See *Trakhtenberg*, 493 Mich at 52. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 US at 691. The failure to call a witness or present other evidence only constitutes ineffective assistance of counsel when it deprives a defendant of a substantial defense. See *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). "A substantial defense is one that might have made a difference in the outcome of the trial." See *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009) (quotation omitted).

## B. ANALYSIS

Defendant argues that pursuant to his testimony at trial, he was at his girlfriend's house throughout 2014 and never left that house. Defendant has provided this Court with an affidavit from the girlfriend generally confirming that defendant lived with her in October 2014, and adding that defendant had no access to a motor vehicle and that the house was at least an hour away from the park on foot. However, we are not persuaded that the affidavit establishes that trial counsel undertook inadequate investigation or erred by failing to call the girlfriend as a witness.

The trial proceedings were marked by defendant's tendency to interject into the proceedings, despite repeated admonitions by the trial court that doing so was inappropriate. Defendant repeatedly announced his various theories of innocence and perceived inadequacies in his representation to the trial court, both during the proceedings and in several handwritten letters. In none of them did defendant mention an alibi witness as far as we can determine. Furthermore, the affidavit itself states that the girlfriend "discussed these facts with the police detective and [defendant's] trial attorney." Thus, trial counsel was certainly aware of the girlfriend. Even if we decline to consider the affidavit as an improper expansion of the record, the record itself would show that counsel was certainly aware of the girlfriend. Although defendant was represented by different counsel during the preliminary examination, the girlfriend was apparently present in the courtroom. According to the presentence investigation report, defendant and the girlfriend had been in a relationship "since mid-July 2014" and

continued to be in a relationship. Although defendant testified against trial counsel's advice, and counsel was initially uncertain how to proceed with defendant's testimony, counsel readily asked defendant about his whereabouts in October 2014. This strongly suggests that counsel knew defendant would testify that he was at his girlfriend's house. Thus, we find it extremely implausible that counsel's choice not to call the girlfriend as a witness was an oversight.

As noted, we presume the decision not to call the girlfriend as a witness to have been a matter of strategy. See *People v Unger*, 278 Mich App 210, 242-243; 749 NW2d 272 (2008). Counsel was likely reasonably concerned by the girlfriend's credibility, or even the possibility that calling her as a witness would be suborning perjury. See *People v Collier*, 105 Mich App 46, 56; 306 NW2d 387 (1981). Especially in light of the DNA evidence and defendant's own testimony, we cannot conclude that the decision not to call the girlfriend as a witness was unsound or that it would have made any difference to the outcome of the proceedings. Consequently, we find no reason to remand this matter for an evidentiary hearing. The decision not to call the girlfriend as a witness did not deprive defendant of a substantial defense, particularly in light of the DNA evidence and the fact that her presumed testimony would have been cumulative. See *Chapo*, 283 Mich App at 371.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Amy Ronayne Krause
/s/ Michael F. Gadola